# FIRST NATIONAL CITY BANK *v.* BANCO NACIONAL DE CUBA

No. 70–295.   Argued February 22, 1972—Decided June 7, 1972

REHNQUIST, J., announced the Court's judgment and delivered an opinion in which BURGER, C. J., and WHITE, J., joined. DOUGLAS, J., filed an opinion concurring in the result, *post*, p. 770. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 773. BRENNAN, J., filed a dissenting opinion in which STEWART, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 776.

*Henry Harfield* argued the cause and filed briefs for petitioner.

*Victor Rabinowitz* argued the cause for respondent. With him on the brief was *Leonard B. Boudin*.

*Solicitor General Griswold* filed a memorandum for the United States as *amicus curiae* urging reversal.

MR. JUSTICE REHNQUIST announced the judgment of the Court, and delivered an opinion in which THE CHIEF JUSTICE and MR. JUSTICE WHITE join.

In July 1958, petitioner loaned the sum of $15 million to a predecessor of respondent. The loan was secured by a pledge of United States Government bonds. The loan was renewed the following year, and in 1960 $5 million was repaid, the $10 million balance was renewed for one year, and collateral equal to the value of the portion repaid was released by petitioner.

Meanwhile, on January 1, 1959, the Castro government came to power in Cuba. On September 16, 1960, the Cuban militia, allegedly pursuant to decrees of the Castro government, seized all of the branches of petitioner located in Cuba. A week later the bank retaliated by selling the collateral securing the loan, and applying the proceeds of the sale to repayment of the principal and unpaid interest. Petitioner concedes

that an excess of at least $1.8 million over and above principal and unpaid interest was realized from the sale of the collateral. Respondent sued petitioner in the Federal District Court to recover this excess, and petitioner, by way of setoff and counterclaim, asserted the right to recover damages as a result of the expropriation of its property in Cuba.

The District Court recognized that our decision in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964), holding that generally the courts of one nation will not sit in judgment on the acts of another nation within its own territory would bar the assertion of the counterclaim, but it further held that congressional enactments since the decision in *Sabbatino* had "for all practical purposes" overruled that case. Following summary judgment in favor of the petitioner in the District Court on all issues except the amount by which the proceeds of the sale of collateral exceeded the amount that could properly be applied to the loan by petitioner, the parties stipulated that in any event this difference was less than the damages that petitioner could prove in support of its expropriation claim if that claim were allowed. Petitioner then waived any recovery on its counterclaim over and above the amount recoverable by respondent on its complaint, and the District Court then rendered judgment dismissing respondent's complaint on the merits.

On appeal, the Court of Appeals for the Second Circuit held that the congressional enactments relied upon by the District Court did not govern this case, and that our decision in *Sabbatino* barred the assertion of petitioner's counterclaim. We granted certiorari and vacated the judgment of the Court of Appeals for consideration of the views of the Department of State which had been furnished to us following the filing of the petition for certiorari. 400 U. S. 1019 (1971).

Upon reconsideration, the Court of Appeals by a divided vote adhered to its earlier decision. We again granted certiorari. 404 U. S. 820 (1971).

We must here decide whether, in view of the substantial difference between the position taken in this case by the Executive Branch and that which it took in *Sabbatino,* the act of state doctrine prevents petitioner from litigating its counterclaim on the merits. We hold that it does not.

The separate lines of cases enunciating both the act of state and sovereign immunity doctrines have a common source in the case of *The Schooner Exchange* v. *M'Faddon,* 7 Cranch 116, 146 (1812). There Chief Justice Marshall stated the general principle of sovereign immunity: sovereigns are not presumed without explicit declaration to have opened their tribunals to suits against other sovereigns. Yet the policy considerations at the root of this fundamental principle are in large part also the underpinnings of the act of state doctrine. The Chief Justice observed:

> "The arguments in favor of this opinion which have been drawn from the general inability of the judicial power to enforce its decisions in cases of this description, from the consideration, that *the sovereign power of the nation is alone competent to avenge wrongs committed by a sovereign,* that the questions to which such wrongs give birth are rather *questions of policy than of law,* that they are for diplomatic, rather than legal discussion, are of great weight, and merit serious attention." (Emphasis added.)

Thus, both the act of state and sovereign immunity doctrines are judicially created to effectuate general notions of comity among nations and among the respective branches of the Federal Government. The history and

the legal basis of the act of state doctrine are treated comprehensively in the Court's opinion in *Sabbatino, supra.* The Court there cited Chief Justice Fuller's "classic American statement" of the doctrine, found in *Underhill* v. *Hernandez,* 168 U. S. 250, 252 (1897):

> "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

The act of state doctrine represents an exception to the general rule that a court of the United States, where appropriate jurisdictional standards are met, will decide cases before it by choosing the rules appropriate for decision from among various sources of law including international law. *The Paquete Habana,* 175 U. S. 677 (1900). The doctrine precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State. It is clear, however, from both history and the opinions of this Court that the doctrine is not an inflexible one. Specifically, the Court in *Sabbatino* described the act of state doctrine as "a principle of decision binding on federal and state courts alike but compelled by neither international law nor the Constitution," 376 U. S., at 427, and then continued:

> "[I]ts continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Id.,* at 427–428.

In *Sabbatino,* the Executive Branch of this Government, speaking through the Department of State, advised attorneys for *amici* in a vein which the Court described as being "intended to reflect no more than the Department's then wish not to make any statement bearing on this litigation." *Id.,* at 420. The United States argued before this Court in *Sabbatino* that the Court should not "hold, for the first time, that executive silence regarding the act of state doctrine is equivalent to executive approval of judicial inquiry into the foreign act."

In the case now before us, the Executive Branch has taken a quite different position. The Legal Adviser of the Department of State advised this Court on November 17, 1970, that as a matter of principle where the Executive publicly advises the Court that the act of state doctrine need not be applied, the Court should proceed to examine the legal issues raised by the act of a foreign sovereign within its own territory as it would any other legal question before it. His letter refers to the decision of the court below in *Bernstein* v. *N. V. Nederlandsche-Amerikaansche,* 210 F. 2d 375 (CA2 1954), as representing a judicial recognition of such a principle, and suggests that the applicability of the principle was not limited to the *Bernstein* case. The Legal Adviser's letter then goes on to state:

> "The Department of State believes that the act of state doctrine should not be applied to bar consideration of a defendant's counterclaim or set-off against the Government of Cuba in this or like cases."

The question that we must now decide is whether the so-called *Bernstein* exception to the act of state doctrine should be recognized in the context of the facts before the Court. In *Sabbatino,* the Court said:

> "This Court has never had occasion to pass upon the so-called *Bernstein* exception, nor need it do so now." 376 U. S., at 420.

The act of state doctrine, like the doctrine of immunity for foreign sovereigns, has its roots, not in the Constitution, but in the notion of comity between independent sovereigns. *Sabbatino, supra,* at 438; *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955); *The Schooner Exchange* v. *M'Faddon,* 7 Cranch 116 (1812).[1] It is also buttressed by judicial deference to the exclusive power of the Executive over conduct of relations with other sovereign powers and the power of the Senate to advise and consent on the making of treaties. The issues presented by its invocation are therefore quite dissimilar to those raised in *Zschernig* v. *Miller,* 389 U. S. 429 (1968), where the Court struck down an Oregon statute that was held to be "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.,* at 432.

The line of cases from this Court establishing the act of state doctrine justifies its existence primarily on the basis that juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government. The Court's opinion in *Underhill* v. *Hernandez,* 168 U. S. 250 (1897), stressed the fact that the revolutionary government of Venezuela had been recognized by the United States.

---

[1] In the latter case, speaking of sovereign immunity, Chief Justice Marshall said:

"It seems then to the Court, to be a principle of public law, that national ships of war, entering the port of a friendy power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction.

"Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals. But until such power be exerted in a manner not to be misunderstood, the sovereign cannot be considered as having imparted to the ordinary tribunals a jurisdiction, which it would be a breach of faith to exercise." 7 Cranch, at 145–146.

In *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302 (1918), the Court was explicit:

> "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision. . . . It has been specifically decided that 'Who is the sovereign, *de jure* or *de facto*, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government. . . .' "

*United States* v. *Belmont*, 301 U. S. 324 (1937), is another case that emphasized the exclusive competence of the Executive Branch in the field of foreign affairs.[2] A year earlier, the Court in *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, 319 (1936), had quoted with approval the statement of John Marshall when he was a member of the House of Representatives dealing with this same subject:

> " 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' "

The opinion of Scrutton, L. J., in *Luther* v. *James Sagor & Co.*, [1921] 3 K. B. 532, described in *Sabbatino* as a "classic case" articulating the act of state doctrine "in terms not unlike those of the United States cases," strongly suggests that under the English doctrine the

---

[2] "Governmental power over external affairs is not distributed, but is vested exclusively in the national government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government." 301 U. S., at 330.

Executive by representation to the courts may waive the application of the doctrine:

> "But it appears a serious breach of international comity, if a state is recognized as a sovereign independent state, to postulate that its legislation is 'contrary to essential principles of justice and morality.' Such an allegation might well with a susceptible foreign government become a casus belli; and should in my view be the action of the Sovereign through his ministers, and not of the judges in reference to a state which their Sovereign has recognized. . . . The responsibility for recognition or nonrecognition with the consequences of each rests on the political advisers of the Sovereign and not on the judges." *Id.*, at 559.

We think that the examination of the foregoing cases indicates that this Court has recognized the primacy of the Executive in the conduct of foreign relations quite as emphatically as it has recognized the act of state doctrine. The Court in *Sabbatino* throughout its opinion emphasized the lead role of the Executive in foreign policy, particularly in seeking redress for American nationals who had been the victims of foreign expropriation, and concluded that any exception to the act of state doctrine based on a mere silence or neutrality on the part of the Executive might well lead to a conflict between the Executive and Judicial Branches. Here, however, the Executive Branch has expressly stated that an inflexible application of the act of state doctrine by this Court would not serve the interests of American foreign policy.

The act of state doctrine is grounded on judicial concern that application of customary principles of law to judge the acts of a foreign sovereign might frustrate the conduct of foreign relations by the political branches

of the government. We conclude that where the Executive Branch, charged as it is with primary responsibility for the conduct of foreign affairs, expressly represents to the Court that application of the act of state doctrine would not advance the interests of American foreign policy, that doctrine should not be applied by the courts. In so doing, we of course adopt and approve the so-called *Bernstein* exception to the act of state doctrine. We believe this to be no more than an application of the classical common-law maxim that "[t]he reason of the law ceasing, the law itself also ceases" (Black's Law Dictionary 288 (4th ed. 1951)).

Our holding is in no sense an abdication of the judicial function to the Executive Branch. The judicial power of the United States extends to this case, and the jurisdictional standards established by Congress for adjudication by the federal courts have been met by the parties. The only reason for not deciding the case by use of otherwise applicable legal principles would be the fear that legal interpretation by the judiciary of the act of a foreign sovereign within its own territory might frustrate the conduct of this country's foreign relations. But the branch of the government responsible for the conduct of those foreign relations has advised us that such a consequence need not be feared in this case. The judiciary is therefore free to decide the case without the limitations that would otherwise be imposed upon it by the judicially created act of state doctrine.

It bears noting that the result we reach is consonant with the principles of equity set forth by the Court in *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955). Here respondent, claimed by petitioner to be an instrument of the government of Cuba, has sought to come into our courts and secure an adjudication in its favor, without submitting to decision on the merits of the counterclaim which petitioner asserts against

it.  Speaking of a closely analogous situation in *Republic of China, supra,* the Court said:

> "We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery.  It wants our law, like any other litigant, but it wants our law free from the claims of justice.  It becomes vital, therefore, to examine the extent to which the considerations which led this Court to bar a suit against a sovereign in *The Schooner Exchange* are applicable here to foreclose a court from determining, according to prevailing law, whether the Republic of China's claim against the National City Bank would be unjustly enforced by disregarding legitimate claims against the Republic of China.  As expounded in *The Schooner Exchange,* the doctrine is one of implied consent by the territorial sovereign to exempt the foreign sovereign from its 'exclusive and absolute' jurisdiction, the implication deriving from standards of public morality, fair dealing, reciprocal self-interest, and respect for the 'power and dignity' of the foreign sovereign." *Id.,* at 361–362.

The act of state doctrine, as reflected in the cases culminating in *Sabbatino,* is a judicially accepted limitation on the normal adjudicative processes of the courts, springing from the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of the Nation's foreign policy.  It would be wholly illogical to insist that such a rule, fashioned because of fear that adjudication would interfere with the conduct of foreign relations, be applied in the face of an assurance from that branch of the Federal Government that conducts foreign relations that such a result would not

obtain. Our holding confines the courts to adjudication of the case before them, and leaves to the Executive Branch the conduct of foreign relations. In so doing, it is both faithful to the principle of separation of powers and consistent with earlier cases applying the act of state doctrine where we lacked the sort of representation from the Executive Branch that we have in this case.

We therefore reverse the judgment of the Court of Appeals, and remand the case to it for consideration of respondent's alternative bases of attack on the judgment of the District Court.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, concurring in the result.

*Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, does not control the central issue in the present case. Rather, it is governed by *National City Bank* v. *Republic of China,* 348 U. S. 356.

I start from the premise that the defendant (petitioner) in the present litigation is properly in the District Court. Respondent, who brought this suit, is for our purposes the sovereign state of Cuba; and, apart from cases where another nation is at war with the United States, it is settled that sovereign states are allowed to sue in the courts of the United States. See *Banco Nacional de Cuba* v. *Sabbatino, supra,* at 408–410.

Cuba sues here to recover the difference between a loan made by petitioner and the proceeds of a sale of the collateral securing the loan. The excess is allegedly about $1.8 million. Petitioner sought to set off against that amount claims arising out of the confiscation of petitioner's Cuban properties. How much those setoffs would be, we do not know. The District Court ruled that the amount of these setoffs "cannot be determined on these motions," 270 F. Supp. 1004, 1011, saying that they represented "triable issues of fact and law." *Ibid.*

I would reverse the Court of Appeals and affirm the District Court, remanding the case for trial on the amount of the setoff and I would allow the setoff up to the amount of respondent's claim.

It was ruled in the *Republic of China* case that a sovereign's claim may be cut down by a counterclaim or setoff. 348 U. S., at 364. The setoff need not be "based on the subject matter" of the claim asserted in the strict sense. The test is "the consideration of fair dealing." *Id.*, at 365. The Court said:

> "The short of the matter is that we are not dealing with an attempt to bring a recognized foreign government into one of our courts as a defendant and subject it to the rule of law to which nongovernmental obligors must bow. We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice. It becomes vital, therefore, to examine the extent to which the considerations which led this Court to bar a suit against a sovereign in *The Schooner Exchange* [7 Cranch 116] are applicable here to foreclose a court from determining, according to prevailing law, whether the Republic of China's claim against the National City Bank would be unjustly enforced by disregarding legitimate claims against the Republic of China. As expounded in *The Schooner Exchange*, the doctrine is one of implied consent by the territorial sovereign to exempt the foreign sovereign from its 'exclusive and absolute' jurisdiction, the implication deriving from standards of public morality, fair dealing, reciprocal self-interest, and respect for the 'power and dignity' of the foreign sovereign." *Id.*, at 361–362.

It would offend the sensibilities of nations if one country, not at war with us, had our courthouse door closed to it. It would also offend our sensibilities if Cuba could collect the amount owed on liquidation of the collateral for the loan and not be required to account for any setoff. To allow recovery without more would permit Cuba to have its cake and eat it too. Fair dealing requires allowance of the setoff to the amount of the claim on which this suit is brought—a precept that should satisfy any so-called rational decision.

If the amount of the setoff exceeds the asserted claim, then we would have a *Sabbatino* type of case. There the fund in controversy was the proceeds of sugar which Cuba had nationalized. *Sabbatino* held that the issue of who was the rightful claimant was a "political question," as its resolution would result in ideological and political clashes between nations which must be resolved by the other branches of government.[1] We would have that type of controversy here if, and to the extent that, the setoff asserted exceeds the amount of Cuba's claim. I would disallow the judicial resolution of that dispute for the reasons stated in *Sabbatino* and by MR. JUSTICE BRENNAN in the instant case. As he states, the Executive Branch "cannot by simple stipulation change a political question into a cognizable claim." But I would allow the setoff to the extent of the claim asserted by Cuba because Cuba is the one who asks our judicial aid in collecting its debt from petitioner and, as the *Republic of China* case says, "fair dealing" requires recognition of any counterclaim or setoff that eliminates or reduces that claim.[2] It is

---

[1] A historic instance of the resolution of such a conflict ultimately enforced by judicial sanctions is *United States* v. *Pink,* 315 U. S. 203.

[2] Cf. *Pons* v. *Republic of Cuba,* 111 U. S. App. D. C. 141, 294 F. 2d 925.

that principle, not the *Bernstein*[3] exception, which should govern here. Otherwise, the Court becomes a mere errand boy for the Executive Branch which may choose to pick some people's chestnuts from the fire, but not others'.[4]

MR. JUSTICE POWELL, concurring in the judgment.

Although I concur in the judgment of reversal and remand, my reasons differ from those expressed by MR. JUSTICE REHNQUIST and MR. JUSTICE DOUGLAS. While *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 419–420 (1964), technically reserves the question of the validity of the *Bernstein* exception (*Bernstein* v. *N. V. Nederlandsche-Amerikaansche,* 210 F. 2d 375 (CA2 1954), as MR. JUSTICE BRENNAN notes in his dissenting opinion, the reasoning of *Sabbatino* implicitly rejects that exception. Moreover, I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction. Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with that very doctrine.

Nor do I find *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955), to be dispositive. The Court there dealt with the question of jurisdiction over the parties to hear a counterclaim asserted against a foreign state seeking redress in our courts. Jurisdiction does not necessarily imply that a court may hear a counterclaim which would otherwise be nonjusticiable. Jurisdiction and justiciability are, in other words, dif-

---

[3] *Bernstein* v. *N. V. Nederlandsche-Amerikaansche,* 210 F. 2d 375.

[4] "The history of the doctrine indicates that its function is not to effect unquestioning judicial deference to the Executive, but to achieve a result under which diplomatic rather than judicial channels are used in the disposition of controversies between sovereigns." Delson, The Act of State Doctrine—Judicial Deference or Abstention? 66 Am. J. Int'l L. 83, 84 (1972).

ferent concepts. One concerns the court's power over the parties; the other concerns the appropriateness of the subject matter for judicial resolution. Although attracted by the justness of the result he reaches, I find little support for MR. JUSTICE DOUGLAS' theory that the counterclaim is justiciable up to, but no further than, the point of setoff.

I nevertheless concur in the judgment of the Court because I believe that the broad holding of *Sabbatino* [1] was not compelled by the principles, as expressed therein, which underlie the act of state doctrine. As Mr. Justice Harlan stated in *Sabbatino*, the act of state doctrine is not dictated either by "international law [or] the Constitution," but is based on a judgment as to "the proper distribution of functions between the judicial and the political branches of the Government on matters bearing upon foreign affairs." 376 U. S., at 427–428. Moreover, as noted in *Sabbatino*, there was no intention of "laying down or reaffirming an inflexible and all-encompassing rule . . . ." *Id.*, at 428.

I do not disagree with these principles, only with the broad way in which *Sabbatino* applied them. Had I been a member of the *Sabbatino* Court, I probably would have joined the dissenting opinion of MR. JUSTICE WHITE. The balancing of interests, recognized as appropriate by *Sabbatino*, requires a careful examination of the facts in each case and of the position, if any, taken by the political branches of government. I do not agree, however, that balancing the functions of the

---

[1] The holding was "that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." 376 U. S., at 428.

judiciary and those of the political branches compels the judiciary to eschew acting in all cases in which the underlying issue is the validity of expropriation under customary international law. Such a result would be an abdication of the judiciary's responsibility to persons who seek to resolve their grievances by the judicial process.

Nor do I think the doctrine of separation of powers dictates such an abdication. To so argue is to assume that there is no such thing as international law but only international political disputes that can be resolved only by the exercise of power. Admittedly, international legal disputes are not as separable from politics as are domestic legal disputes, but I am not prepared to say that international law may never be determined and applied by the judiciary where there has been an "act of state." [2] Until international tribunals command a wider constituency, the courts of various countries afford the best means for the development of a respected body of international law. There is less hope for progress in this long-neglected area if the resolution of all disputes involving an "act of state" is relegated to political rather than judicial processes.

Unless it appears that an exercise of jurisdiction would interfere with delicate foreign relations conducted by the political branches, I conclude that federal courts

---

[2] MR. JUSTICE WHITE's dissenting opinion in *Sabbatino*, citing cases from England, the Netherlands, Germany, Japan, Italy, and France, states:

"No other civilized country has found such a rigid rule [as that announced in *Sabbatino*] necessary for the survival of the executive branch of its government; the executive of no other government seems to require such insulation from international law adjudications in its courts; and no other judiciary is apparently so incompetent to ascertain and apply international law." 376 U. S., at 440 (footnote omitted).

have an obligation to hear cases such as this. This view is not inconsistent with the basic notion of the act of state doctrine which requires a balancing of the roles of the judiciary and the political branches. When it is shown that a conflict in those roles exists, I believe that the judiciary should defer because, as the Court suggested in *Sabbatino,* the resolution of one dispute by the judiciary may be outweighed by the potential resolution of multiple disputes by the political branches.

In this case where no such conflict has been shown, I think the courts have a duty to determine and apply the applicable international law. I therefore join in the Court's decision to remand the case for further proceedings.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join, dissenting.

The Court today reverses the judgment of the Court of Appeals for the Second Circuit which declined to engraft the so-called *"Bernstein"* exception upon the act of state doctrine as expounded in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964).[1] The Court,

---

[1] "The classic American statement of the act of state doctrine, which appears to have taken root in England as early as 1674 . . . and began to emerge in the jurisprudence of this country in the late eighteenth and early nineteenth centuries, . . . is found in *Underhill* v. *Hernandez,* 168 U. S. 250 [1897], where Chief Justice Fuller said for a unanimous Court (p. 252):

" 'Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.' " *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 416 (1964).

The so-called *"Bernstein"* exception to this principle derives from *Bernstein* v. *N. V. Nederlandsche-Amerikaansche,* 210 F. 2d 375

nevertheless, affirms the Court of Appeals' rejection of the *"Bernstein"* exception. Four of us in this opinion unequivocally take that step, as do MR. JUSTICE DOUGLAS and MR. JUSTICE POWELL in their separate opinions concurring in the result or judgment.

The anomalous remand for further proceedings results because three colleagues, MR. JUSTICE REHNQUIST, joined by THE CHIEF JUSTICE and MR. JUSTICE WHITE, adopt the contrary position, while MR. JUSTICE DOUGLAS finds *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955), dispositive in the circumstances of this case and MR. JUSTICE POWELL rejects the specific holding in *Sabbatino,* believing it was not required by the principles underlying the act of state doctrine.

MR. JUSTICE REHNQUIST's opinion reasons that the act of state doctrine exists primarily, and perhaps even solely, as a judicial aid to the Executive to avoid embarrassment to the political branch in the conduct of foreign rela-

---

(1954), where the Court of Appeals for the Second Circuit allowed the plaintiff to challenge the validity of the expropriation of his property by Nazi Germany in view of a letter from the Acting Legal Adviser of the Department of State to the effect:

" 'The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property (or compensation in lieu thereof) lost through force, coercion, or duress as a result of Nazi persecution in Germany, is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.' " *Id.,* at 376.

The *"Bernstein"* exception has been successfully applied only once. As the Court of Appeals noted in this case, 442 F. 2d 530, 535 (1971):

"[T]he *Bernstein* exception has been an exceedingly narrow one. Prior to the present case, a 'Bernstein letter' has been issued only once—in the *Bernstein* case itself. Moreover, the case has never been followed successfully; it has been relied upon only twice, and in both of those instances, by lower courts whose decisions were subsequently reversed."

tions. Where the Executive expressly indicates that invocation of the rule will not promote domestic foreign policy interests, his opinion states the view, adopting the *"Bernstein"* exception, that the doctrine does not apply. This syllogism—from premise to conclusion— is, with all respect, mechanical and fallacious. Moreover, it would require us to abdicate our judicial responsibility to define the contours of the act of state doctrine so that the judiciary does not become embroiled in the politics of international relations to the damage not only of the courts and the Executive but of the rule of law.

MR. JUSTICE REHNQUIST's opinion also finds support for its result in *National City Bank,* and MR. JUSTICE DOUGLAS would remand on the authority of that case alone. In his view, "[f]air dealing" requires that a foreign sovereign suing in our courts be subject to setoffs, even though counterclaims are barred by the act of state doctrine for amounts exceeding the state's claim. I believe that *National City Bank* is not at all in point, and that my Brother DOUGLAS' view leads to the strange result that application of the act of state doctrine depends upon the dollar value of a litigant's counterclaim.

Finally, MR. JUSTICE POWELL acknowledges that *Sabbatino,* not *National City Bank,* controls this case, but, nonetheless, votes to remand on the ground that *Sabbatino* was wrongly decided. In my view, nothing has intervened in the eight years since that decision to put its authority into question.

## I

On September 16 and 17, 1960, the Government of Cuba nationalized the branch offices of petitioner in Cuba. Petitioner promptly responded by selling collateral that had previously been pledged in security for a loan it had made to a Cuban instrumentality. Respondent—

alleged by petitioner to be an agent of the Cuban Government [2]—in turn, instituted this action to recover the excess of the proceeds of the sale over the accrued interest and principal of the loan.[3] Petitioner then counterclaimed for the value of its Cuban properties, alleging that they had been expropriated in violation of international law.[4] On cross-motions for summary judgment,

[2] The District Court, on cross-motions for summary judgment, found respondent to be "one and the same" as the Government of Cuba. 270 F. Supp. 1004, 1006 (1967). Respondent argues that its relationship with Cuba was a disputed issue of fact that could not properly be resolved before trial. This issue, not decided by the Court of Appeals, see 431 F. 2d 394, 397 (1970), is necessarily open for consideration on remand.

[3] The complaint also pleaded a second cause of action that is not material to the issues before us.

[4] Petitioner actually asserts two counterclaims—first, that the Cuban expropriation was invalid, giving rise to damages, and, second, that Cuba became indebted to petitioner, regardless of the validity of the expropriation decree. Moreover, petitioner invokes Cuban and United States as well as international law in support of both claims. These refinements are of no avail to petitioner. If applicable, the act of state doctrine, of course, bars consideration of both international law claims; although the Court in *Sabbatino* stated its holding in terms that "the Judicial Branch will not examine the *validity* of a taking of property within its own territory by a foreign sovereign government . . . ," 376 U. S., at 428 (emphasis added), the holding clearly embraced judicial review not only of the taking but of the obligation to make "prompt, adequate, and effective compensation." *Id.*, at 429. See also *id.*, at 433.

Similarly, petitioner's allegations do not state cognizable claims under Cuban law. *Sabbatino* affirmed that United States courts will not sit in judgment on the validity of a foreign act of state under foreign law, for such an inquiry "would not only be exceedingly difficult but, if wrongly made, would be likely to be highly offensive to the state in question." *Id.*, at 415 n. 17. The same rationale applies to petitioner's assertion that it is entitled to compensation under Cuban law. Although foreign causes of action may, of course, be entertained in appropriate circumstances in our courts, the claim in issue presents the same dangers as the claim of invalidity of the expropriation under Cuban law. In any

the District Court held that petitioner "is entitled to set-off as against [respondent's] claim for relief any amounts due and owing to it from the Cuban Government by reason of the confiscation of [its] Cuban properties." 270 F. Supp. 1004, 1011 (1967). The Court of Appeals for the Second Circuit reversed on the ground that the act of state doctrine, as applied in *Sabbatino,* forecloses judicial review of the nationalization of petitioner's branch offices. 431 F. 2d 394 (1970).[5]

While a petition to this Court was pending for a writ of certiorari, the Legal Adviser of the Department of State advised us that the act of state doctrine should

event, as the Court indicated in *Sabbatino, ibid.,* if Cuban law governs, the test to be applied is the success petitioner's claims would receive in Cuba itself. It cannot seriously be contended that Cuban courts would hold the nationalization of petitioner's properties invalid or Cuba liable to petitioner for meaningful compensation. Indeed, although Art. 24 of the Fundamental Law of Cuba provides for compensation for certain public takings, Cuban Law No. 851, pursuant to which petitioner's properties were nationalized, itself declares in Art. 6 that "[t]he resolutions . . . in the forced expropriation proceedings instituted hereunder may not be appealed, as no remedial action shall be available there against." Moreover, the promise of compensation provided under Law No. 851 may, as the Court said in *Sabbatino, id.,* at 402, "well be deemed illusory."

Finally, United States law becomes relevant only if the public-policy-of-the-forum exception to the *lex loci* conflict-of-laws rule is recognized—that is, if the American forum is free, because of its public policy, to deny recognition to Cuban law otherwise applicable as the law of the situs of the property seized. But the very purpose of the act of state doctrine is to forbid application of that exception. See generally, *e. g.,* Henkin, Act of State Today: Recollections in Tranquility, 6 Colum. J. of Transnat'l L. 175 (1967). See also *Sabbatino, supra,* at 438.

[5] In arriving at this conclusion, the court found inapplicable the Hickenlooper Amendment to the Foreign Assistance Act of 1961, 78 Stat. 1013, as amended, 22 U. S. C. § 2370 (e)(2). I agree with my colleagues in leaving that determination undisturbed.

not be applied to bar consideration of counterclaims in the circumstances of this case. More particularly, the Legal Adviser stated: [6]

"Recent events, in our view, make appropriate a determination by the Department of State that the act of state doctrine need not be applied when it is raised to bar adjudication of a counterclaim or setoff when (a) the foreign state's claim arises from a relationship between the parties existing when the act of state occurred; (b) the amount of the relief to be granted is limited to the amount of the foreign state's claim; and (c) the foreign policy interests of the United States do not require application of the doctrine.

.    .    .    .    .

"In this case, the Cuban government's claim arose from a banking relationship with the defendant existing at the time the act of state—expropriation of defendant's Cuban property—occurred, and defendant's counterclaim is limited to the amount of the Cuban government's claim. We find, moreover, that the foreign policy interests of the United States do not require the application of the act of state doctrine to bar adjudication of the validity of a defendant's counterclaim or set-off against the Government of Cuba in these circumstances.

"The Department of State believes that the act of state doctrine should not be applied to bar consideration of a defendant's counterclaim or set-off against the Government of Cuba in this or like cases."

We granted certiorari, vacated the judgment of the Court of Appeals, and, without expressing any views on the

_____
[6] The text of the Legal Adviser's views appears in full in 442 F. 2d, at 536–538.

merits of the case, remanded for reconsideration in light of this statement of position by the Department of State. 400 U. S. 1019 (1971). On remand the Court of Appeals adhered to its original decision, 442 F. 2d 530 (1971), and we again granted certiorari, 404 U. S. 820 (1971).

## II

The opinion of MR. JUSTICE REHNQUIST, joined by THE CHIEF JUSTICE and MR. JUSTICE WHITE, states that "[t]he only reason for not deciding the case by use of otherwise applicable legal principles would be the fear that legal interpretation by the judiciary of the act of a foreign sovereign within its own territory might frustrate the conduct of this country's foreign relations." Even if this were a correct description of the rationale for the act of state doctrine, the conclusion that the reason for the rule ceases when the Executive, as here, requests that the doctrine not be applied plainly does not follow. In *Sabbatino* this Court reviewed at length the risks of judicial review of a foreign expropriation in terms of the possible prejudice to the conduct of our external affairs. The Court there explained, 376 U. S., at 432–433:

> "If the Executive Branch has undertaken negotiations with an expropriating country, but has refrained from claims of violation of the law of nations, a determination to that effect by a court might be regarded as a serious insult, while a finding of compliance with international law, would greatly strengthen the bargaining hand of the other state with consequent detriment to American interests.

> "Even if the State Department has proclaimed the impropriety of the expropriation, the stamp of approval of its view by a judicial tribunal, however impartial, might increase any affront and the judicial decision might occur at a time, almost always well

after the taking, when such an impact would be contrary to our national interest. Considerably more serious and far-reaching consequences would flow from a judicial finding that international law standards had been met if that determination flew in the face of a State Department proclamation to the contrary. . . . In short, whatever way the matter is cut, the possibility of conflict between the Judicial and Executive Branches could hardly be avoided."

This reasoning may not apply where the Executive expressly stipulates that domestic foreign policy interests will not be impaired however the court decides the validity of the foreign expropriation. But by definition those cases can only arise where the political branch is indifferent to the result reached, and that surely is not the case before us. The United States has protested the nationalization by Cuba of property belonging to American citizens as a violation of international law. The United States has also severed diplomatic relations with that government. The very terms of the Legal Adviser's communication to this Court, moreover, anticipate a favorable ruling that the Cuban expropriation of petitioner's properties was invalid.[7]

---

[7] The Legal Adviser states:

"Recent events, in our view, make appropriate a determination by the Department of State that the act of state doctrine need not be applied [in cases of this kind] . . . .

"The 1960's have seen a great increase in expropriations by foreign governments of property belonging to United States citizens. Many corporations whose properties are expropriated, financial institutions for example, are vulnerable to suits in our courts by foreign governments as plaintiff[s], for the purpose of recovering deposits or sums owed them in the United States without taking into account the institutions' counterclaims for their assets expropriated in the foreign country."

The implication is clear that the Legal Adviser believes that such

*Sabbatino* itself explained why in these circumstances the representations of the Executive in favor of removing the act of state bar cannot be followed: "It is highly questionable whether the examination of validity by the judiciary should depend on an educated guess by the Executive as to probable result and, at any rate, should a prediction be wrong, the Executive might be embarrassed in its dealings with other countries." *Id.,* at 436. Should the Court of Appeals on remand uphold the Cuban expropriation in this case, the Government would not only be embarrassed but would find its extensive efforts to secure the property of United States citizens abroad seriously compromised.[8]

Nor can it be argued that this risk is insubstantial because the substantive law controlling petitioner's claims is clear. The Court in *Sabbatino* observed that "[t]here are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens." *Id.,*

---

corporations are entitled to offsetting redress for the value of their nationalized property. Note, 12 Harv. Int'l L. J. 557, 576–577 (1971). It is also significant that the Government in the past has acknowledged "that a *'Bernstein* letter,' should one be issued in special circumstances where it might be appropriate, plainly does not seek to decide the case in question, but merely removes the act of state bar to judicial consideration of the foreign act." Brief for the United States as *Amicus Curiae,* in *Banco Nacional de Cuba* v. *Sabbatino,* No. 16, O. T. 1963, p. 38. The Government makes no such representation in this case. Note, 12 Harv. Int'l L. J., at 571 and n. 74. To the contrary, the Government now argues: "By disregarding [the] statement of Executive policy involving foreign investment by American firms, the court below has seriously restricted the capacity of the government to assist American investors in securing prompt, adequate and effective compensation for expropriation of American property abroad." Memorandum for the United States as *Amicus Curiae* 3.

[8] See *Sabbatino,* 376 U. S., at 432: "Relations with third countries which have engaged in similar expropriations would not be immune from effect."

at 428.[9] And this observation, if anything, has more force in this case than in *Sabbatino,* since respondent argues with some substance that the Cuban nationalization of petitioner's properties, unlike the expropriation at issue in *Sabbatino,* was not discriminatory against United States citizens.

Thus, the assumption that the Legal Adviser's letter removes the possibility of interference with the Executive in the conduct of foreign affairs is plainly mistaken.

## III

That, however, is not the crux of my disagreement with my colleagues who would uphold the *"Bernstein"* exception. My Brother REHNQUIST's opinion asserts that the act of state doctrine is designed primarily, and perhaps even entirely, to avoid embarrassment to the political branch. Even a cursory reading of *Sabbatino,* this Court's most recent and most exhaustive treatment of the act of state doctrine, belies this contention. Writing for a majority of eight in *Sabbatino,* Mr. Justice Harlan laid bare the foundations of the doctrine as follows, *id.,* at 427–428:

> "If the act of state doctrine is a principle of decision binding on federal and state courts alike but compelled by neither international law nor the Constitution, its continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs. It should be apparent that the greater the degree of codification or consensus concerning a

---

[9] It bears repeating here what the Court said in a footnote to this statement, *id.,* at 429 n. 26: "We do not, of course, mean to say that there is no international standard in this area; we conclude only that the matter is not meet for adjudication by domestic tribunals." See n. 14, *infra.*

particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, as in the *Bernstein* case [see n. 1, *supra*], for the political interest of this country may, as a result, be measurably altered."

Applying these principles to the expropriation before the Court, Mr. Justice Harlan noted the lack of consensus among the nations of the world on the power of a state to take alien property, and stated further that "[i]t is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations." *Id.,* at 430. He reviewed as well the possible adverse effects from judicial review of foreign expropriations on the conduct of our external affairs, discussed above, and emphasized the powers of the Executive "to ensure fair treatment of United States nationals," *id.,* at 435, in comparison to the "[p]iecemeal dispositions," *id.,* at 432, that courts could make:

"Following an expropriation of any significance, the Executive engages in diplomacy aimed to assure that

United States citizens who are harmed are compensated fairly. Representing all claimants of this country, it will often be able, either by bilateral or multilateral talks, by submission to the United Nations, or by the employment of economic and political sanctions, to achieve some degree of general redress. Judicial determinations of invalidity of title can, on the other hand, have only an occasional impact, since they depend on the fortuitous circumstance of the property in question being brought into this country." *Id.,* at 431.

"When one considers the variety of means possessed by this country to make secure foreign investment, the persuasive or coercive effect of judicial invalidation of acts of expropriation dwindles in comparison." *Id.,* at 435.[10]

Only in view of all these considerations did he conclude, *id.,* at 428:

"[T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law."

In short, *Sabbatino* held that the validity of a foreign act of state in certain circumstances is a "political ques-

---

[10] Mr. Justice Harlan also observed that "[a]nother serious consequence" of suspending the act of state bar "would be to render uncertain titles in foreign commerce, with the possible consequence of altering the flow of international trade." 376 U. S., at 433. See also *id.,* at 437 (impact on flow of trade, though not security of title, even where sovereign is plaintiff). This consideration, of course, does not apply where, as here, the property seized is not an exportable commodity.

tion" not cognizable in our courts.[11] Only one—and not necessarily the most important—of those circumstances concerned the possible impairment of the Executive's conduct of foreign affairs. Even if this factor were absent in this case because of the Legal Adviser's statement of position, it would hardly follow that the act of state doctrine should not foreclose judicial review of the expropriation of petitioner's properties. To the contrary, the absence of consensus on the applicable international rules, the unavailability of standards from a treaty or other agreement, the existence and recognition of the Cuban Government, the sensitivity of the issues to national concerns, and the power of the Executive alone to effect a fair remedy for all United States citizens who have been harmed all point toward the existence of a "political question." The Legal Adviser's letter does not purport to affect these considerations at all. In any event, when coupled with the possible consequences to the conduct of our foreign relations explored above, these considerations compel application of the act of state doctrine, notwithstanding the Legal Adviser's suggestion to the contrary.[12] The

---

[11] Cf. *Baker* v. *Carr,* 369 U. S. 186, 211–212 (1962):

"Our cases in this field [of political questions involving foreign relations] seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action."

[12] A comparison of the facts in the *Bernstein* case, n. 1, *supra,* with the circumstances of this case reinforces this conclusion. As the Government itself has acknowledged, Brief for the United States as *Amicus Curiae* in *Sabbatino,* n. 7, *supra,* at 37–38:

"The circumstances leading to the State Department's letter in the *Bernstein* case were of course most unusual. The governmental acts there were part of a monstrous program of crimes against humanity; the acts had been condemned by an international

Executive Branch, however extensive its powers in the area of foreign affairs, cannot by simple stipulation change a political question into a cognizable claim.[13]

tribunal after a cataclysmic world war which was caused, at least in part, by acts such as those involved in the litigation, and the German State no longer existed at the time of [the] State Department's letter. Moreover, the principle of payment of reparations by the successor German government had already been imposed, at the time of the 'Bernstein letter,' upon the successor government, so that there was no chance that a suspension of the act of state doctrine would affect the negotiation of a reparations settlement."

On these facts the result, though not the rationale, in Bernstein may be defensible. See, e. g., R. Falk, The Status of Law in International Society 407 and n. 12 (1970).

[13] My Brother REHNQUIST's opinion attempts to bolster its result by drawing an analogy between the act of state doctrine and the rule of deference to the Executive in the areas of sovereign immunity and recognition of foreign powers. That rule has itself been the subject of much debate and criticism. See generally, e. g., R. Falk, The Role of Domestic Courts in the International Legal Order 139–169 (1964); Lillich, The Proper Role of Domestic Courts in the International Legal Order, 11 Va. J. Int'l L. 9, 9–27 (1970); Note, 53 Minn. L. Rev. 389 (1968). See also Sabbatino, 376 U. S., at 411 n. 12. The analogy, in any case, is not persuasive. When the Judicial Branch in the past has followed an Executive suggestion of immunity in behalf of a foreign government or accorded significant weight to the failure of the Executive to make such a suggestion, the result has been simply either to foreclose judicial consideration of the claim against that government or to allow the suit to proceed on the merits of the claim and any other defenses the government may have. See, e. g., Mexico v. Hoffman, 324 U. S. 30 (1945); Ex parte Peru, 318 U. S. 578 (1943). Similarly, when the Judicial Branch has abided by an Executive determination of foreign sovereignty, the consequence has been merely to require or deny the application of various principles governing the attributes of sovereignty. See, e. g., United States v. Belmont, 301 U. S. 324 (1937); Russian Republic v. Cibrario, 235 N. Y. 255, 139 N. E. 259 (1923). In no event has the judiciary necessarily been called upon to assess a claim under international law. The effect of following a "Bernstein letter," of course, is exactly the opposite—the Judicial Branch must reach a judgment despite

*Sabbatino,* as my Brother REHNQUIST's opinion notes, formally left open the validity of the *"Bernstein"* exception to the act of state doctrine. But that was only because the issue was not presented there. As six members of this Court recognize today, the reasoning of that-case is clear that the representations of the Department of State are entitled to weight for the light they shed on the permutation and combination of factors underlying the act of state doctrine. But they cannot be determinative.

## IV

To find room for the *"Bernstein"* exception in *Sabbatino* does more than disservice to precedent. MR. JUSTICE REHNQUIST's opinion states: "Our holding is in no sense an abdication of the judicial function to the Executive Branch." With all respect, it seems patent that the contrary is true. The task of defining the contours of a political question such as the act of state doctrine is exclusively the function of this Court. *Baker* v. *Carr,* 369 U. S. 186 (1962), and cases cited therein; see R. Falk, The Status of Law in International Society 413 (1970). The *"Bernstein"* exception relinquishes the function to the Executive by requiring blind adherence to its requests that foreign acts of state be reviewed. Conversely, it politicizes the judiciary. For the Executive's invitation to lift the act of state bar can only be accepted at the expense of supplanting the political branch in its role as a constituent of the international law-making community. As *Sabbatino,* 376 U. S., at 432–433, indicated, it is the function of the Executive to act "not

---

the possible absence of consensus on the applicable rules, the risk of irritation to sensitive concerns of other countries, and the danger of impairment to the conduct of our foreign policy. *E. g.,* Note, 12 Harv. Int'l L. J., at 575–577. See also *Sabbatino, supra,* at 438.

only as an interpreter of generally accepted and traditional rules, as [do] the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns." [14] The *"Bernstein"* exception, nevertheless, assigns the task of advocacy to the judiciary by calling for a judgment where consensus on controlling legal principles is absent. Note, 40 Fordham L. Rev. 409, 417 (1971). Thus, it countenances an exchange of roles between the judiciary

---

[14] This consideration, it may be noted, resolves the paradox MR. JUSTICE WHITE, dissenting in *Sabbatino,* saw between the Court's finding there of an absence of consensus on the international rules governing expropriations and the Court's purpose to avoid embarrassment to the Executive in the conduct of external affairs. "I fail to see," he stated, "how greater embarrassment flows from saying that the foreign act does not violate clear and widely accepted principles of international law than from saying, as the Court does, that nonexamination and validation are required because there are no widely accepted principles to which to subject the foreign act." 376 U. S., at 465. There is, however, no inconsistency:

"The explicit holding in [*Sabbatino*] makes reference to the capacity of domestic courts and not to the status of the customary norms. All that *Sabbatino* says is that a domestic court is not an appropriate forum wherein to apply a rule of customary international law unless that rule is supported by a consensus at least wide enough to embrace the parties to the dispute. Such judicial self-restraint may not be appropriate if the forum is an international tribunal entrusted with competence by both sides, but the situation is different for a domestic court. The appearance of impartiality is as important to the formulation of authoritative law as is the actuality of impartiality. The [consequence] is that a domestic court, however manfully it struggles to achieve impartiality, will not be able to render an authoritative judgment when the adjudication requires it to decide whether the forum state or the foreign state is correct about its contentions as to the content of customary international law. The act of state doctrine, in the absence of a firm agreement on the rules of decision, acknowledges this incapacity of domestic courts." Falk, n. 12, *supra,* at 415.

and the Executive, contrary to the firm insistence in *Sabbatino* on the separation of powers.[15]

The consequence of adopting the *"Bernstein"* approach would only be to bring the rule of law both here at home and in the relations of nations into disrespect. Indeed, the fate of the individual claimant would be subject to the political considerations of the Executive Branch. Since those considerations change as surely as administrations change, similarly situated litigants would not be likely to obtain even-handed treatment. This is all too evident in the very case before us. The Legal Adviser's suggestion that the act of state doctrine does not apply here is carefully couched in terms applicable only to setoffs "against the Government of Cuba in this or like cases," see *supra*, at 781— that is, where the Executive finds in its discretion that invocation of the doctrine is not required in the interests of American foreign policy vis-à-vis Cuba. Note, 12 Harv. Int'l L. J. 557, 562, 572 (1971).[16] In *Zschernig* v. *Miller*, 389 U. S. 429 (1968), this Court struck down an Oregon escheat statute as an unconstitutional invasion of the National Government's power over external affairs, despite advice from the Executive that the law did not unduly interfere with the conduct of our foreign policy. Paraphrasing from what my Brother STEWART said there, *id.*, at 443 (concurring opinion), we must conclude here:

> "Resolution of so fundamental [an] issue [as the basic division of functions between the Executive

---

[15] See *Sabbatino*, 376 U. S., at 423, 427–428: "The act of state doctrine does . . . have 'constitutional' underpinnings." And "its continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs."

[16] For an account of how political considerations may have affected a State Department determination in a specific case, see Note, 75 Harv. L. Rev. 1607, 1610–1611 (1962).

and the Judicial Branches] cannot vary from day to day with the shifting winds at the State Department. Today, we are told, [judicial review of a foreign act of state] does not conflict with the national interest. Tomorrow it may." See also *id.*, at 434–435 (DOUGLAS, J.).

No less important than fair and equal treatment to individual litigants is the concern that decisions of our courts command respect as dispassionate opinions of principle. Nothing less will suffice for the rule of law. Yet the *"Bernstein"* approach is calculated only to undermine regard for international law. It is, after all, as *Sabbatino* said, 376 U. S., at 434–435, a "sanguine presupposition that the decisions of the courts of the world's major capital exporting country and principal exponent of the free-enterprise system would be accepted as disinterested expressions of sound legal principle by those adhering to widely different ideologies." This is particularly so where, as under the *"Bernstein"* approach, the determination of international law is made to depend upon a prior political authorization. *E. g.,* R. Falk, The Role of Domestic Courts in the International Legal Order 93–94, 136–137 (1964).

## V

MR. JUSTICE REHNQUIST's opinion finds support for the result it reaches in *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955), and MR. JUSTICE DOUGLAS bases his decision on that case alone. *National City Bank* held that, by bringing suit in our courts, a foreign sovereign waives immunity on offsetting counterclaims, whether or not related to the sovereign's cause of action. Nothing in that decision spoke to the applicability of the act of state doctrine. My Brother REHNQUIST's opinion, nevertheless, seizes on language there that a sovereign

suing in our courts "wants our law" and so should be held bound by it as a matter of equity. In a similar vein, my Brother DOUGLAS states that "[i]t would . . . offend our sensibilities if Cuba could collect the amount owed on . . . [her claim] and not be required to account for any setoff." Yet, on the assumption that equitable principles are relevant to respondent's cause of action, see Note, 75 Harv. L. Rev. 1607, 1619 (1962), it is by no means clear that the balance of equity tips in petitioner's favor. It cannot be argued that by seeking relief in our courts on a claim that does not involve any act of state, respondent has waived the protection of the act of state doctrine in defense to petitioner's counterclaims. See *ibid.* Furthermore, as the Court of Appeals pointed out below, 442 F. 2d, at 535, petitioner "is seeking a windfall at the expense of other" claimants whose property Cuba has nationalized. Our Government has blocked Cuban assets in this country for possible use by the Foreign Claims Settlement Commission to compensate fairly all American nationals who have been harmed by Cuban expropriations. Although those assets are not now vested in the United States or authorized to be distributed to claimants, it is reasonable to assume that they will be if other efforts at settling claims with Cuba are unavailing. In that event, if petitioner prevails here, it will, in effect, have secured a preference over other claimants who were not so fortunate to have had Cuban assets within their reach and whose only relief is before the Claims Commission. Conversely, if respondent prevails, its recovery will become a vested asset for fair and ratable distribution to all claimants, including petitioner. See 431 F. 2d, at 403–404.

More important, reliance on *National City Bank* overlooks the fact that "our law" that respondent "wants" includes the act of state doctrine, to which we have adhered for decades, as the precedents on which *Sabbatino* re-

lied demonstrate. See n. 1, *supra.* As *Sabbatino* indicated, 376 U. S., at 438, the doctrine, "although it shares with the immunity doctrine a respect for sovereign states," serves important policies entirely independent of that rule. See n. 13, *supra.* And those policies, with one exception, see n. 10, *supra,* apply with full force in this case, as we have seen. Indeed, MR. JUSTICE DOUGLAS concedes as much by recognizing that the political-question rationale of *Sabbatino* would preclude a judgment for petitioner in excess of Cuba's claim. Why petitioner's counterclaims are any the less premised on a political question when they are stated only as offsets is not, and cannot rationally be, explained.

In *Sabbatino* itself the Court considered "whether Cuba's status as a plaintiff [seeking to recover the proceeds of property it had expropriated] . . . dictates a result at variance with the conclusions reached [requiring application of the act of state doctrine]." 376 U. S., at 437. The Court held that it did not, noting that "[t]he sensitivity in regard to foreign relations and the possibility of embarrassment of the Executive are, of course, heightened by the presence of a sovereign plaintiff. The rebuke to a recognized power would be more pointed were it a suitor in our courts." *Ibid.* The Court observed, too, *id.,* at 438:

"Certainly the distinction proposed would sanction self-help remedies, something hardly conducive to a peaceful international order. Had [the defendant] not converted [the proceeds of the property Cuba had expropriated] . . . , Cuba could have relied on the act of state doctrine in defense of a claim brought . . . for the proceeds. It would be anomalous to preclude reliance on the act of state doctrine because of [the defendant's] unilateral action, however justified such action may have been under the circumstances."

These considerations, equally applicable here, together with the general policies underlying the act of state doctrine caused the Court to conclude that Cuba's status as a plaintiff was immaterial. But the Court went on to determine whether there were any remaining litigable issues for determination on remand and held that "any counterclaim [against Cuba] based on asserted invalidity [of its expropriation] must fail." *Id.,* at 439. *Sabbatino* thus answered the very point on which some of my Brethren now rely—and, furthermore, did so in the face of *National City Bank,* as the Court's discussion of that decision in *Sabbatino, id.,* at 438, shows.