**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 21, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LAWRENCE GOLAN; ESTATE OF
RICHARD KAPP; S. A.
PUBLISHING CO., INC., doing
business as ESS.A.Y. Recordings;
SYMPHONY OF THE CANYONS;
RON HALL, doing business as
Festival Films; JOHN MCDONOUGH,
doing business as Timeless Video
Alternatives International,

      Plaintiffs-Appellees and Cross-
      Appellants,

v.

ERIC H. HOLDER, JR., in his official
capacity as Attorney General of the
United States; MARYBETH PETERS,
in her official capacity as Register of
Copyrights, Copyright Office of the
United States,

      Defendants-Appellants and
      Cross-Appellees.

ASSOCIATION OF AMERICAN
PUBLISHERS,

      Defendant.

_____

MOTION PICTURE ASSOCIATION
OF AMERICA, INC.;
INTERNATIONAL COALITION FOR
COPYRIGHT PROTECTION; THE
AMERICAN SOCIETY OF
COMPOSERS, AUTHORS AND

Nos. 09-1234 & 09-1261

PUBLISHERS; THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS; THE ASSOCIATION OF AMERICAN PUBLISHERS; BROADCAST MUSIC, INC.; THE MUSIC PUBLISHERS ASSOCIATION OF THE UNITED STATES; THE SOFTWARE AND INFORMATION INDUSTRY ASSOCIATION; THE RECORDING INDUSTRY ASSOCIATION OF AMERICA; REED ELSERVIER, INC.; HOUGHTON MIFFLIN HARCOURT PUBLISHING CO.; PROFESSOR DANIEL GERVAIS,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:01-CV-01854-LTB-BNB)**

---

John S. Koppel, Attorney (Tony West, Assistant Attorney General; David M. Gaouette, Acting United States Attorney; William Kanter, Attorney, with him on the briefs), Appellate Staff, Civil Division, Department of Justice, Washington, D.C., for Defendants-Appellants and Cross-Appellees.

Anthony T. Falzone, Attorney, Center for Internet and Society, Stanford Law School, Stanford, California, (Julie A. Ahrens, Attorney, Center for Internet and Society, Stanford Law School, Stanford, California; Hugh Q. Gottschalk and Carolyn J. Fairless, of Wheeler Trigg O'Donnell LLP, Denver, Colorado; and Lawrence Lessig, Harvard Law School, Cambridge, Massachusetts, with him on the briefs), for Plaintiffs-Appellees and Cross-Appellants.

Paul Bender, Christopher A. Mohr, and Michael R. Klipper, of Meyer, Klipper & Mohr PLLC, Washington, D.C.; Thomas Kanan and Jonathan Decker, of McElroy, Deutsch, Mulvaney & Carpenter, Greenwood Village, Colorado, filed an amici

2

curiae brief for the American Society of Composers, Authors and Publishers, the American Society of Media Photographers, the Association of American Publishers, Broadcast Music, Inc., Houghton Mifflin Harcourt Publishing Co., the Music Publishers Association of the United States, the Software and Information Industry Association, the Recording Industry Association of America, and Reed Elsevier, Inc.

Seth P. Waxman, Randolph D. Moss, D. Hien Tran, and Thomas Saunders, of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., have filed an amicus curiae brief for the Motion Picture Association of America, Inc.

Eric M. Lieberman, David B. Goldstein, and Christopher J. Klatell, of Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, New York, have filed an amicus curiae brief for the International Coalition for Copyright Protection.

Alan C. Friedberg of Pendleton, Friedberg, Wilson & Hennessey, P.C., Denver, Colorado, has filed an amicus curiae brief for Professor Daniel J. Gervais.

---

Before **BRISCOE,** Chief Judge, **CUDAHY,**[*] and **TACHA**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

Plaintiffs brought this action challenging the constitutionality of Section 514 of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, § 514, 108 Stat. 4809, 4976–81 (1994) (codified as amended at 17 U.S.C. §§ 104A, 109), which granted copyright protection to various foreign works that were previously in the public domain in the United States. The district court granted plaintiffs' motion for summary judgment, concluding that Section 514

---

[*] The Honorable Richard D. Cudahy, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

violates plaintiffs' freedom of expression under the First Amendment. In Case No. 09-1234, the government appeals the district court's order granting plaintiffs' motion for summary judgment and denying the government's motion, arguing that Section 514 is a valid, content-neutral regulation of speech. In Case No. 09-1261, plaintiffs cross-appeal, contending that the statute is facially invalid and that they are entitled to injunctive relief. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the judgment of the district court and conclude that Section 514 of the URAA is not violative of the First Amendment.

## I. Statutory Background

In 1989, the United States joined the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"). The Berne Convention requires each signatory to provide the same copyright protections to authors in other member countries that it provides to its own authors. Pursuant to Article 18, when a country joins the Convention, it must provide copyright protection to preexisting foreign works even when those works were previously in the public domain in that country.[1] However, when the United States joined the Berne

---

[1] Article 18 of the Berne Convention provides:

(1)    This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.

(2)    If, however, through the expiry of the term of protection which

(continued...)

4

Convention, the implementing legislation did not extend copyrights to any foreign works that were already in the public domain in the United States. See Berne Convention Implementation Act of 1988, Pub. L. 100-568, § 12 , 102 Stat. 2853, 2860 ("Title 17, United States Code, as amended by this Act, does not provide copyright protection for any work that is in the public domain in the United States."); see generally 7 William F. Patry, Patry on Copyright § 24:21 (2010).

In April 1994, the United States signed various trade agreements in the Uruguay Round General Agreement on Tariffs and Trade. Included in this round of agreements was the Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPs). The TRIPs agreement required, in part, that its signatories comply with Article 18 of the Berne Convention, and thus, extend copyright protection to all works of foreign origin whose term of protection had

---

[1](...continued)
> was previously granted, a work has fallen into the public domain of the country where protection is claimed, that work shall not be protected anew.

> (3)　The application of this principle shall be subject to any provisions contained in special conventions to that effect existing or to be concluded between countries of the Union. In the absence of such provisions, the respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle.

> (4)　The preceding provisions shall also apply in the case of new accessions to the Union . . . .

Berne Convention, art. 18, Sept. 9, 1886 (revised at Paris on July 24, 1971).

5

not expired. Unlike the Berne Convention, the TRIPs agreement provided for dispute resolution before the World Trade Organization. See Patry on Copyright at § 24:1.

In order to comply with these international agreements, Congress enacted the URAA. In particular, Section 514 of the URAA implements Article 18 of the Berne Convention. Section 514 "restores"[2] copyrights in foreign works that were formerly in the public domain in the United States for one of three specified reasons: failure to comply with formalities, lack of subject matter protection, or lack of national eligibility. See 17 U.S.C. § 104A(a), (h)(6)(C). Section 514 does not restore copyrights in foreign works that entered the public domain through the expiration of the term of protection. See id. § 104A(h)(6)(B).

In addition to restoring copyrights in preexisting foreign works, Section 514 provides some protections for reliance parties[3] such as plaintiffs who had

---

[2] Although Section 514 grants copyright protection to works that never obtained copyrights in the United States, as well as works that lost copyright protection for failing to comply with various formalities, the parties refer to this as copyright "restoration," and the statute likewise refers to "restored works," see 17 U.S.C. § 104A(h)(6). For clarity and consistency, we will as well.

[3] A "reliance party" is defined as a person who:

(A) with respect to a particular work, engages in acts, before the source country of that work becomes an eligible country, which would have violated section 106 if the restored work had been subject to copyright protection, and who, after the source country becomes an eligible country, continues to engage in such acts;

(continued...)

6

exploited these works prior to their restoration.  See id. § 104A(d)(2)–(4).  In

order to enforce a restored copyright against a reliance party, a foreign copyright

owner must either file notice with the Copyright Office within twenty-four

months of restoration, id. § 104A(d)(2)(A)(i), or serve actual notice on the

reliance party, id. § 104A(d)(2)(B)(i).  A reliance party is liable for infringing

acts that occur after the end of a twelve month grace period, starting from notice

of restoration, id. § 104A(d)(2)(A)(ii)(I), (d)(2)(B)(ii)(I).  Reliance parties may

sell or otherwise dispose of restored works during this grace period, id. § 109(a),

but they cannot make additional copies during this time, id.

§ 104A(d)(2)(A)(ii)(III), (d)(2)(B)(ii)(III).

Section 514 provides further protections for reliance parties who, prior to

restoration, created a derivative work[4] that was based on a restored work.  Under

---

[3](...continued)
(B) before the source country of a particular work becomes an eligible
country, makes or acquires 1 or more copies or phonorecords of that
work; or

(C) as the result of the sale or other disposition of a derivative work
covered under subsection (d)(3), or significant assets of a person
described in subparagraph (A) or (B), is a successor, assignee, or
licensee of that person.

17 U.S.C. § 104(A)(h)(4).

[4] "A 'derivative work' is a work based upon one or more preexisting works,
such as a translation, musical arrangement, dramatization, fictionalization, motion
picture version, sound recording, art reproduction, abridgment, condensation, or
any other form in which a work may be recast, transformed, or adapted.  A work
(continued...)

7

Section 514, "a reliance party may continue to exploit that derivative work for the duration of the restored copyright if the reliance party pays to the owner of the restored copyright reasonable compensation . . . ." Id. § 104A(d)(3)(A). If the parties are unable to agree on reasonable compensation, a federal court will determine the amount of compensation. See id. § 104A(d)(3)(B).

## II. Factual and Procedural Background

The factual background is not in dispute. Plaintiffs are orchestra conductors, educators, performers, publishers, film archivists, and motion picture distributors who have relied on artistic works in the public domain for their livelihoods. They perform, distribute, and sell public domain works. The late plaintiff Kapp created a derivative work—a sound recording based on several compositions by Dmitri Shostakovich. Section 514 of the URAA provided copyright protection to these foreign works, removing them from the public domain in the United States. As a result, plaintiffs are either prevented from using these works or are required to pay licensing fees to the copyright holders—fees that are often cost-prohibitive for plaintiffs.

Plaintiffs filed this action, challenging the constitutionality of the Copyright Term Extension Act, Pub. L. No 105-298, § 102(b), (d), 112 Stat. 2827,

---

[4](...continued)
consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." 17 U.S.C. § 101.

2827–28 (1998), and Section 514 of the URAA, seeking declaratory and injunctive relief. Initially, the district court granted summary judgment to the government. On appeal, we concluded that plaintiffs' challenge to the Copyright Term Extension Act was foreclosed by the Supreme Court's decision in Eldred v. Ashcroft, 537 U.S. 186 (2003). See Golan v. Gonzales, 501 F.3d 1179, 1182 (10th Cir. 2007) ("Golan I"). We also held that "[Section] 514 of the URAA ha[d] not exceeded the limitations inherent in the Copyright Clause" of the United States Constitution. Id.[5] We recognized that "legislation promulgated pursuant to the Copyright Clause must still comport with other express limitations of the Constitution," id. at 1187, and concluded that plaintiffs had "shown sufficient free expression interests in works removed from the public domain to require First Amendment scrutiny of [Section] 514," id. at 1182. We then remanded the case to the district court to "assess whether [Section] 514 is content-based or content-neutral," id. at 1196, and to apply the appropriate level of constitutional scrutiny.

On remand, the parties filed cross-motions for summary judgment. The government and plaintiffs agreed that Section 514 is a content-neutral regulation of speech, and thus should be subject to intermediate scrutiny. The district court concluded that "to the extent Section 514 suppresses the right of reliance parties

---

[5] The Constitution provides Congress with the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8.

9

to use works they exploited while the works were in the public domain," Section 514 was unconstitutional. Golan v. Holder, 611 F. Supp. 2d 1165, 1177 (D. Colo. 2009). Consequently, the district court granted plaintiffs' motion for summary judgment, and denied the government's motion.

The government timely appealed the district court's order, arguing that Section 514 of the URAA does not violate the First Amendment. Plaintiffs cross-appealed, arguing that the district court failed to provide all of the relief that they requested. Specifically, plaintiffs request that we adjudicate their facial challenge to Section 514, direct the district court to enjoin Attorney General Holder from enforcing the statute, and order the Register of Copyrights Marybeth Peters to cancel the copyright registrations of restored works.

### III. Government's Appeal (No. 09-1234)

"We review de novo challenges to the constitutionality of a statute." Am. Target Adver., Inc. v. Giani, 199 F.3d 1241, 1247 (10th Cir. 2000). Because this case implicates the First Amendment, "we have 'an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" Citizens for Peace in Space v. City of Colorado Springs, 477 F.3d 1212, 1219 (10th Cir. 2007) (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)).

The parties agree that Section 514 of the URAA is a content-neutral

10

regulation of speech, and thus, is subject to intermediate scrutiny.  Although their position is "not controlling given our special standard of de novo review," id. at 1220, we agree that Section 514 is a content-neutral regulation of speech.

In determining whether a regulation is content-neutral or content-based, "'the government's purpose in enacting the regulation is the controlling consideration.'"  Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 686 (10th Cir. 1998) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (brackets omitted)).  The primary inquiry "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  Ward, 491 U.S. at 791.  "If the regulation serves purposes unrelated to the content of expression it is considered neutral, even if it has an incidental effect on some speakers or messages but not others."  Z.J. Gifts, 136 F.3d at 686 (quotations and citation omitted).  On its face, Section 514 is content-neutral.  Moreover, there is no indication that the government adopted Section 514 "'because of agreement or disagreement with the message [that the regulated speech] conveys.'"  See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994) ("Turner I") (brackets omitted, quoting Ward, 491 U.S. at 791).  Congress primarily enacted Section 514 to comply with the United States' international obligations and to protect American authors' rights abroad.  Therefore, we agree that it is a content-neutral regulation.

In reviewing the constitutionality of a content-neutral regulation of speech,

11

we apply "an intermediate level of scrutiny, because in most cases [such regulations] pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Id. (internal citation omitted). Applying intermediate scrutiny, a content-neutral statute "will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 189 (1997) ("Turner II").

The government argues on appeal that Section 514 is narrowly tailored to advancing three important governmental interests: (1) attaining indisputable compliance with international treaties and multilateral agreements, (2) obtaining legal protections for American copyright holders' interests abroad, and (3) remedying past inequities of foreign authors who lost or never obtained copyrights in the United States. We hold that the government has demonstrated a substantial interest in protecting American copyright holders' interests abroad, and Section 514 is narrowly tailored to advance that interest.[6] Consequently, the district court erred in concluding that Section 514 violates plaintiffs' First

---

[6] Accordingly, we do not reach the validity of the government's first or third asserted interests, i.e., that Section 514 advances the government's interest in "indisputable compliance" with the Berne Convention, Appellant's Br. at 30, or that it remedies historic inequities of foreign authors who lost or never obtained copyrights in the United States. We offer no opinion on whether these asserted interests, by themselves, are sufficient to withstand intermediate scrutiny.

Amendment rights.

*A. Governmental Interest*

**1. Section 514 addresses a substantial or important governmental interest.**

In order for a statute to survive intermediate scrutiny, the statute must be directed at an important or substantial governmental interest unrelated to the suppression of free expression. See Turner I, 512 U.S. at 662. We have no difficulty in concluding that the government's interest in securing protections abroad for American copyright holders satisfies this standard.

Copyright serves to advance both the economic and expressive interests of American authors. See Eldred, 537 U.S. at 211–13. In addition to creating economic incentives that further expression, copyright also serves authors' First Amendment interests. "[F]reedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all.'" Harper & Row Publishers, Inc. v. Nation Enter., 471 U.S. 539, 559 (1985) (quoting Wooley v. Maynard, 430 U.S. 705, 714 (1977)); see also Eldred, 537 U.S. at 221. "Courts and commentators have recognized that copyright . . . serve[s] this countervailing First Amendment value" of the freedom not to speak. Harper & Row, 471 U.S. at 560.

Plaintiffs contend that the government does not have an important interest in a "reallocation of speech interests" between American reliance parties and American copyright holders. Appellees' Br. at 48. However, the Supreme Court

has recognized that not all First Amendment interests are equal. See Eldred, 537 U.S. at 221. "The First Amendment securely protects the freedom to make—or decline to make—one's own speech; it bears less heavily when speakers assert the right to make other people's speeches." Id. Although plaintiffs have First Amendment interests, see Golan I, 501 F.3d at 1194, so too do American authors.

Securing foreign copyrights for American works preserves the authors' economic and expressive interests. These interests are at least as important or substantial as other interests that the Supreme Court has found to be sufficiently important or substantial to satisfy intermediate scrutiny. See, e.g., Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 807 (1984) ("The problem addressed by this ordinance–the visual assault . . . presented by an accumulation of signs posted on public property–constitutes a significant substantive evil within the City's power to prohibit."). Accordingly, Section 514 advances an important or substantial governmental interest unrelated to the suppression of free expression.

### 2. Section 514 addresses a real harm.

The government's asserted interest cannot be merely important in the abstract—the statute must be directed at a real, and not merely conjectural, harm. Turner I, 512 U.S. at 664 (plurality opinion). Thus, we must examine whether Section 514 was "designed to address a real harm, and whether [it] will alleviate [that harm] in a material way." See Turner II, 520 U.S. at 195. In undertaking

14

this review, we "must accord substantial deference to the predictive judgments of Congress. Our sole obligation is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." Id. (quotations and citation omitted).

"[S]ubstantiality is to be measured in this context by a standard more deferential than we accord to judgments of an administrative agency." Id. This deferential standard is warranted for two important reasons. First, Congress is "far better equipped" as an institution "to amass and evaluate the vast amounts of data bearing upon the legislative questions." Id. (quotations and citation omitted). Second, we owe Congress "an additional measure of deference out of respect for its authority to exercise the legislative power." Id. at 196.

> Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments . . . .

Id.

Additionally, the other branches' judgments regarding foreign affairs warrant special deference from the courts. See Citizens for Peace in Space, 477 F.3d at 1221 ("Courts have historically given special deference to other branches in matters relating to foreign affairs, international relations, and national security; even when constitutional rights are invoked by a plaintiff."). The Supreme Court has "consistently acknowledged that the nuances of the foreign policy of the

15

United States are much more the province of the Executive Branch and Congress than of [the courts]." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 386 (2000) (quotations and alterations omitted); see also Regan v. Wald, 468 U.S. 222, 242 (1984) (noting the "classical deference to the political branches in matters of foreign policy"); First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 765 (1972) (discussing the "judicial deference to the exclusive power of the Executive over conduct of relations with other sovereign powers and the power of the Senate to advise and consent on the making of treaties"). As such, we apply considerable deference to Congress and the Executive in making decisions that require predictive judgments in the areas of foreign affairs.

To be clear, we do not suggest that Congress's decisions regarding foreign affairs are entirely immune from the requirements of the First Amendment. See Turner I, 512 U.S. at 666 (plurality opinion) ("That Congress' predictive judgments are entitled to substantial deference does not mean, however, that they are insulated from meaningful judicial review altogether."); see also Boos v. Barry, 485 U.S. 312, 323 (1988) ("[I]t is well established that no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." (quotations and citation omitted)). Rather, we merely acknowledge that in undertaking our constitutional review of a content-neutral statute, Congress's predictive judgments are entitled to "substantial deference," Turner II, 520 U.S. at 195, and

16

in this particular context, our review of Congress's predictive judgments is further informed by the special deference that Congress and the Executive Branch deserve in matters of foreign affairs.

Turning to the issue at hand, prior to enacting Section 514 of the URAA, Congress heard testimony addressing the interests of American copyright holders. In particular, American works were unprotected in several foreign countries, to the detriment of the United States' interests. See General Agreement on Tariffs and Trade (GATT): Intellectual Property Provisions: Joint Hearing on H.R. 4894 and S. 2368 Before the Subcomm. on Intellectual Property and Judicial Administration of the H. Comm. on the Judiciary and the Subcomm. on Patents, Copyrights, and Trademarks of the S. Comm. on the Judiciary, 103d Cong., 2d Sess., 262 (1994) [hereinafter "Joint Hearings"] (statement of Jason S. Berman, Chairman and CEO of the Recording Industry Association of America) ("[T]here are vastly more US works currently unprotected in foreign markets than foreign ones here, and the economic consequences of [granting retroactive copyright protection] are dramatically in favor of US industries.").[7] By some estimates, billions of dollars were being lost each year because foreign countries were not providing copyright protections to American works that were in the public domain

---

[7] The parties have cited to portions of the Congressional hearings regarding the intellectual property provisions of the Uruguay Round Agreements. We take judicial notice of the entirety of these hearings. See Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1168 n.12 (10th Cir. 2000).

17

abroad.  See id. at 246 (statement of Eric Smith, Executive Director and General Counsel of the International Intellectual Property Alliance) ("Literally billions of dollars have been and will be lost every year by U.S. authors, producers and publishers because of the failure of many of our trading partners to protect U.S. works which were created prior to the date the U.S. established copyright relations with that country, or, for other reasons, these works have fallen prematurely out of copyright in that country.").

Congress had substantial evidence from which it could reasonably conclude that the ongoing harms to American authors were real and not merely conjectural. Around the globe, American works were being exploited without the copyright owners' consent and without providing compensation.  Thus, there was a "substantial basis to support Congress' conclusion that a real threat justified enactment of" Section 514 of the URAA.  See Turner II, 520 U.S. at 196.

### 3. Substantial evidence supported the conclusion that Section 514 would alleviate these harms.

Next, we must determine whether there was substantial evidence from which Congress could conclude that Section 514 would alleviate these harms to American copyright holders.  See id. at 213.  At the Joint Hearings, Congress heard testimony that by refusing to restore copyrights in foreign works in the public domain, the United States was not in compliance with its obligations under the Berne Convention.  See Joint Hearings at 137 (statement of Ira Shapiro,

18

General Counsel, Office of the U.S. Trade Representative) ("It is likely that other [World Trade Organization] members would challenge the current U.S. implementation of Berne Article 18 . . . ."); id at 248 (statement of Eric Smith) ("Many of our trading partners, particularly in Europe, have made it clear to this country that they consider us in violation of our obligations under Article 18."). In addition, the United States' refusal to restore foreign copyrights was harming American authors' interests abroad: foreign countries were following the United States' example of refusing to restore copyrights in works in the public domain. See id. at 137 (statement of Ira Shapiro) ("Some other countries, such as Thailand and Russia, have refused to protect U.S. works in the public domain in their territory citing the U.S. interpretation of Berne Article 18 as justification.").

Further, the United States' trading partners had represented that they would restore American copyrights only if the United States restored foreign copyrights. See id. at 249 n.2 (statement of Eric Smith) ("The Russian government has made clear that it will provide retroactive protection for 'works' only if the U.S. reciprocates with retroactive protection for Russian works."). Foreign countries were willing to provide, at most, reciprocal copyright protections to American works. See id. at 120 (Appendix to Statement of Bruce Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks) ("When we have urged others to provide protection for our industries' repertoire of existing copyrighted works, we are often confronted with the position that such

19

protection will be provided there when we protect their works in the same manner here in the United States. Clearly, providing for such protection for existing works in our own law will improve our position in future negotiations."). Moreover, the United States had an opportunity to set an example for copyright restoration for other countries. See id. at 225 (statement of Irwin Karp, Counsel, Committee for Literary Studies) ("U.S. retroactive protection for foreign works in our public domain may induce other countries with whom we recently established copyright relations to grant retroactive protection to contemporary U.S. works that previously fell into their public domains."). Thus, if the United States wanted certain protections for American authors, it had to provide those protections for foreign authors.

Plaintiffs aver that Congress was presented with evidence regarding the need to restore copyrights generally, but that there was no evidence that Congress needed to provide limited protections for reliance parties. According to plaintiffs, there is "no support for the conclusion that enacting more stringent measures against reliance parties . . . would have any impact whatsoever on the behavior of foreign countries." Appellees' Br. at 46. To the contrary, Congress heard testimony that the United States' chosen method and scope of copyright restoration would impact other nations that were similarly deciding how to restore copyrights.

In particular, Congress heard testimony that the United States could set an

20

example regarding copyright restoration, and other countries might mirror the United States' approach. For example, Ira Shapiro, General Counsel of the Office of the United States Trade Representative, testified that "the choices made in our implementation of the TRIPs agreement will set an example for other countries as governments decide on their own implementing legislation as well as influence future disputes over the obligations of the Agreement." Joint Hearings at 136; see also id. at 134 ("U.S. leadership in achieving prompt approval of the Uruguay Round Agreements and effective implementation of the obligations in those agreements is vital and will set the pattern for other countries to follow."). Additionally, Eric Smith, speaking on behalf of a consortium of trade associations whose members represented both American copyright industries and reliance parties, testified as follows:

> The fact is that what the United States does in this area will carry great weight in the international community. If we interpret Article 18 and the TRIPS provisions to deny protection or significantly limit its scope, our trading partners – just now considering their own implementing legislation – will feel free to simply mirror our views. If the largest exporter of copyrighted material in the world takes the position that we have no, or only limited, obligations, the United States will have little credibility in convincing particularly the new nations with whom we are just starting copyright relations to give us the expansive protection that we need.

Joint Hearings at 247 (emphases added); see also id. at 248 ("[T]aking this action in the 'implementing' legislation will convey clearly the view of the U.S. that it believes that other countries are similarly required to adopt the same position in

21

pending legislation or otherwise clarify that foreign preexisting works must be fully recaptured and protected." (emphases added)); id. at 131 (testimony of Ira Shapiro) ("[A]s the world leader, it is critically important that we implement fully in the retroactivity area."); id. at 291 (testimony of Jason S. Berman) ("[T]he Russians simply said to the United States negotiators . . . that they will interpret their obligations on retroactivity in exactly the same manner that the United States interprets its obligations.  So what we are doing here, I believe, is establishing by virtue of what we do the ground rule for retroactivity."); id. at 256 (statement of Jack Valenti, President and CEO of the Motion Picture Association of America) ("If the U.S. 'retroactively' protects works from, for example, Russia, the former Soviet Republics, the former Eastern Bloc countries, South Korea, China, then we have every reason to expect those countries to protect previously produced American creative works.").  Thus, Congress heard testimony from a number of witnesses that the United States' position on the scope of copyright restoration—which necessarily includes the enforcement against reliance parties—was critical to the United States' ability to obtain similar protections for American copyright holders.

Further, Congress squarely faced the need to balance the interests of American copyright holders and American reliance parties.[8]  In his opening

---

[8] The testimony to Congress was primarily concerned with reliance parties' possible claims under the Takings Clause of the Fifth Amendment.  Plaintiffs

(continued...)

22

remarks, Senator DeConcini stated:

> The conventional wisdom within the U.S. copyright community is that through the restoration of copyright protection to foreign authors we will get more than we give because U.S. authors will be able to retrieve far more works in foreign countries than foreign authors will retrieve here in the United States.
> . . . .
> . . . [I]f we set out to restore copyright protection to foreign works, we must provide protection that is complete and meaningful. By the same token, we must ensure that copyright restoration provides reliance users a sufficient opportunity to recoup their investment.

Id. at 81–82 (Statement of Sen. DeConcini). Congress also heard from Eric Smith, who testified that the bills under consideration would

> provide a careful balance between the need, on the one hand, to establish a "model" provision which other countries could follow in order to secure effective restoration of our copyrights abroad and the need, on the other hand, to balance the rights of foreign authors whose works are restored in the U.S. with the domestic users that may have relied on the public domain status of the work in making investments.

Id. at 252.

In spite of this testimony, plaintiffs contend that the government's interest is too speculative to satisfy intermediate scrutiny. Although we require "substantial evidence" in order to satisfy intermediate scrutiny, see Turner I, 512 U.S. at 667 (plurality opinion), the evidentiary requirement is not as onerous as plaintiffs would have us impose. The Supreme Court has cautioned that imposing too strict of an evidentiary requirement on Congress is "an improper burden for

---

[8](...continued)
have not brought such a claim in the case at bar.

23

courts to impose on the Legislative Branch." Turner II, 520 U.S. at 213

(quotation omitted). An overly demanding "amount of detail is as unreasonable

in the legislative context as it is constitutionally unwarranted. Congress is not

obligated, when enacting its statutes, to make a record of the type that an

administrative agency or court does to accommodate judicial review." Id.

"Sound policymaking often requires legislators to forecast future events

and to anticipate the likely impact of these events based on deductions and

inferences for which complete empirical support may be unavailable." Turner I,

512 U.S. at 665 (plurality opinion). Past conduct may be the best—and

sometimes only—evidence available to Congress in making predictive judgments.

Cf. Ward, 491 U.S. at 800 ("Absent [the regulation at issue], the city's interest

would have been served less well, as is evidenced by the complaints about

excessive volume generated by respondent's past concerts."). We think that this

is especially true in areas that involve predictions of foreign relations and

diplomacy, where empirical data will rarely be available, and to which

considerable deference is owed to Congress and the Executive.

Plaintiffs direct our attention to evidence in the Congressional record that

contradicted the view that other countries would follow the United States'

approach to copyright restoration. More specifically, Irwin Karp stated:

> When these countries grant retroactivity, the theory goes, they
> will deny their reliance interests real protection – if we do so now. But
> this is only a theory, and an unlikely one. Most foreign countries,

including the Commonwealth countries, already grant us retroactivity. They will not change their laws to restrict protection of their reliance parties. Nor will the few important countries who presently do not retroactively protect U.S. works[.] When they do grant retroactivity they can decide what protection they will grant to their reliance interests. There is nothing to stop them from adopting the British et al buy-out provision.

Joint Hearings at 231; see also id. at 224 ("[T]here is absolutely no guarantee that they are stupid enough to adopt the reliance-party provisions you are being asked to adopt."). However, as detailed above, this was not the only evidence in the record regarding the potential effect of the United States' position on copyright restoration. Congress also heard testimony that if it wanted foreign countries to provide strong protections for American authors, Congress needed to provide like protections for foreign authors. See id. at 242 (testimony of Eric Smith) ("With us taking a strong and principled stand here in this country, we can leverage retroactive protection abroad. I almost entirely disagree with Mr. Karp on this point. I think the chances of us obtaining good retroactive protection is quite strong if we have this tool behind us.").

Although Congress was presented with evidence that its position on copyright restoration might not guarantee reciprocation, it does not follow that Section 514 is unconstitutional. "The Constitution gives to Congress the role of weighing conflicting evidence in the legislative process." Turner II, 520 U.S. at 199. Thus, we must determine "whether, given conflicting views . . ., Congress had substantial evidence for making the judgment that it did." Id. at 208. In

25

other words, "[t]he question is not whether Congress, as an objective matter, was correct to determine" that limited protections for reliance parties were "necessary" to garner similar protections from foreign countries.  See id. at 211.  "Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress."  Id.

> In making that determination, we are not to reweigh the evidence de novo, or to replace Congress' factual predictions with our own.  Rather, we are simply to determine if the standard is satisfied.  If it is, summary judgment for [the government] is appropriate regardless of whether the evidence is in conflict.

Id. (internal quotations and citations omitted).

Considering the deference that Congress is owed, particularly in areas of foreign relations, we conclude that Congress's judgments were supported by substantial evidence.  The testimony before Congress indicated that the United States' historically lax position on copyright restoration had been an obstacle to the protection that the United States was seeking for its own copyright owners.  Witnesses further testified that many countries would provide no greater protections to American authors than the United States gave to their foreign counterparts.  There was also testimony that the chosen method of restoring foreign copyrights would have great weight in the international community and could induce other countries to follow the United States' lead, although Congress heard some testimony that other countries would not necessarily follow the United States' approach.  Consequently, Congress was presented with substantial

26

evidence that Section 514 would advance the government's interest in protecting American copyright holders "in a direct and effective way." See id. at 213 (quoting Ward, 491 U.S. at 800). The United States' ability to protect American works abroad would be achieved less effectively absent Section 514, and therefore, the government's interest is genuinely advanced by restoring foreign copyrights with limited protections for reliance parties such as plaintiffs. See Ward, 491 U.S. at 799.

*B. Section 514 does not burden substantially more speech than necessary.*

Under intermediate scrutiny, we must also determine whether Section 514 is narrowly tailored to further the government's interests. See Ward, 491 U.S. at 798. "Content-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do," and therefore, the government has a degree of latitude in choosing how to further its asserted interest. Turner II, 520 U.S. at 213 (quotations and citation omitted). Accordingly, "the [g]overnment may employ the means of its choosing so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further that interest." Id. at 213–14 (internal quotations, ellipses, and citation omitted). Further, the regulation need not be the least-restrictive alternative of advancing the government's interest. Id. at 217–18.

27

**1. Section 514 is narrowly tailored.**

The "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799. "[T]he essence of narrow tailoring" is when a regulation "focuses on the source of the evils the [government] seeks to eliminate . . . without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Id. at 799 n.7. That is, when "the burden imposed by [a regulation] is congruent to the benefits it affords," that regulation is narrowly tailored. Turner II, 520 U.S. at 215–16.

In the case at bar, the burdens imposed on the reliance parties are congruent with the benefits Section 514 affords American copyright holders.[9] As discussed above, the government has a substantial interest in securing protections for American works in foreign countries. Further, Congress heard testimony that the United States could expect foreign countries to provide only as much protection to American copyright holders as the United States would provide to foreign copyright holders, and other countries might follow the United States' example.

_____

[9] We note that copyright includes several "built-in" First Amendment protections. Eldred, 537 U.S. at 219–20. The idea/expression dichotomy ensures that only particular expressions, and not ideas themselves, are subject to copyright protection. Id. Additionally, the fair use defense allows individuals to use expressions contained in a copyrighted work under certain circumstances, including "criticism, comment, news reporting, teaching . . . scholarship, or research . . . and even for parody." Id. (quotations and citation omitted). Section 514 does not disturb these traditional, built-in protections, and thus, such protected speech remains unburdened.

28

In other words, the United States needed to impose the same burden on American reliance parties that it sought to impose on foreign reliance parties. Thus, the benefit that the government sought to provide to American authors is congruent with the burden that Section 514 imposes on reliance parties. The burdens on speech are therefore directly focused to the harms that the government sought to alleviate. "This is the essence of narrow tailoring." Ward, 491 U.S. at 799 n.7.

**2. Alternatives do not undermine the narrow tailoring of Section 514.**

Plaintiffs contend that "the Government could have complied with the Berne Convention while providing significantly stronger protection for the First Amendment interests of reliance parties like the Plaintiffs here." Appellees' Br. at 30. According to plaintiffs, Article 18 of the Berne Convention provides considerable discretion that allows the government to provide greater protections for reliance parties. The government responds that the Berne Convention requires only transitional protections for reliance parties.

The parties' arguments about what the Berne Convention requires and permits are beside the point. As discussed above, the government's interest is not limited to compliance with the Berne Convention. Rather, its interest includes securing protections for American copyright owners in foreign countries, which includes providing copyright protection against foreign reliance parties. Thus, it is immaterial whether, as plaintiffs contend, the government could have complied with the minimal obligations of the Berne Convention and granted stronger

29

protections for American reliance parties. If Congress had provided stronger protections to American reliance parties such as plaintiffs, many foreign countries may have provided similar protections for their own reliance parties, thereby providing less protection for American authors. Thus, even assuming for purposes of this appeal that the United States could have provided stronger protections for American reliance parties while complying with the minimum requirements of the Berne Convention, Section 514 does not burden substantially more speech than necessary to further the government's interest.

Moreover, in concluding that Section 514 is not narrowly tailored, the district court and plaintiffs relied on other countries' approaches to implementing the Berne Convention, specifically, the United Kingdom model. However, we are not persuaded that the constitutionality of Section 514 is undermined by the availability of the United Kingdom model.

First, the "less restrictive-alternative analysis has never been a part of the inquiry into the validity of content-neutral regulations on speech." Turner II, 520 U.S. at 217 (quotations and citation omitted). A statute must be "narrowly tailored to serve the government's legitimate, content-neutral interests," but it "need not be the least restrictive or least intrusive means of doing so." Ward, 491 U.S. at 798. As long as the government does not burden substantially more speech than necessary to advance an important interest, we will not invalidate a statute simply because "the government's interest could be adequately served by

30

some less-speech-restrictive alternative." Id. at 800.

Second, to the extent that the United Kingdom model is relevant to our inquiry, it is not such an obvious and substantially less-speech-restrictive alternative that it undermines the validity of Section 514. Although not necessary to the intermediate scrutiny analysis, the existence of less-speech-restrictive alternatives may be relevant to determining whether Section 514 is narrowly tailored. See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1238 (10th Cir. 1999) (analyzing government restriction on commercial speech under intermediate scrutiny). "'The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny.' This is particularly true when such alternatives are obvious and restrict substantially less speech." Id. (quoting 44 Liqourmart, Inc. v. Rhode Island, 517 U.S. 484, 529 (1996) (O'Connor, J., concurring)). We do not suggest that the existence of a less restrictive alternative is dispositive. See Turner II, 520 U.S. at 217–18 (reaffirming that the presence of a less-restrictive alternative will not necessarily invalidate a regulation under intermediate scrutiny). "We merely recognize the reality that the existence of an obvious and substantially less restrictive means for advancing the desired government objective [may] indicate[] a lack of narrow tailoring." U.S. West, 182 F.3d at 1238 n.11.

With this in mind, we turn to plaintiffs' suggestion that there were less

restrictive means of restoring foreign copyrights.[10]  Although no country has provided full, permanent exemptions for reliance parties, other countries have provided limited protections for reliance parties.  The chief alternative discussed by plaintiffs and the district court is the United Kingdom model.  See Golan, 611 F. Supp. 2d at 1174 ("Several member nations—including Germany, Hungary, the United Kingdom, Australia, and New Zealand—provide accommodations that are temporally permanent so long as certain conditions are met."); Appellees' Br. at 34 ("The provisions implemented by the United Kingdom and a dozen other signatories confirm what the text of Berne makes clear: permanent protection of reliance interests is permissible.").  However, the United Kingdom model is not an obvious and substantially less restrictive alternative.

Under the United Kingdom model, a "reliance party is allowed to continue making those uses of the work it had made, or incurred commitments to make, before its copyright is restored.  But the reliance party can be 'bought out' by the owner of the restored copyright."  Irwin Karp, Final Report, Berne Article 18 Study on Retroactive United States Copyright Protection for Berne and Other Works, 20 Colum.-VLA J.L. & Arts 157, 180 (1996).  Thus, copyright owners can "'buy back' their rights immediately after the entry into force of the law restoring

---

[10] We note that plaintiffs do not argue—and there is no indication in the record—that the United States could have provided strong protections for American reliance parties and obtained strong protections for American copyright holders.  To the contrary, the evidence before Congress suggested that other countries had resisted such one-sided arrangements.

copyright; and thus, there is no 'grace period'" similar to Section 514. Appellant's App., Vol. I at 159.

The United Kingdom model is not substantially less restrictive of speech than Section 514 of the URAA. In the United Kingdom, a copyright owner cannot enforce the copyright against a reliance party unless the owner "buys out" the reliance party. Under Section 514, a copyright owner cannot enforce the copyright against a reliance party unless the owner files notice with the Copyright Office or serves notice on a reliance party. 17 U.S.C. § 104A(d)(2). Moreover, under Section 514, reliance parties have twelve months to continue exploiting the works, although they cannot continue to make copies of the restored work. Id. § 104A(d)(2)(A)(ii)(III), (d)(2)(B)(ii)(III). Under the United Kingdom model, however, the reliance party's interests are immediately terminated upon buy-out. Thus, under both systems, reliance parties receive qualified protection insofar as a reliance party can continue to exploit a work until the copyright owner does something: either buy out the reliance party (United Kingdom model) or file notice (Section 514). Ultimately, both approaches provide the copyright owner with the ability to terminate the reliance party's interests. The only significant difference is that under the United Kingdom model, the reliance party receives compensation from the owner, while under Section 514, the reliance party has a twelve month grace period to continue exploiting the work.

Further, the United Kingdom model is not far more protective of speech

33

interests of reliance parties who have created derivative works, such as the late plaintiff Kapp. Section 514 allows these reliance parties to continue to use a derivative work as long as they pay "reasonable compensation" to the copyright owner. See 17 U.S.C. § 104A(d)(3)(A). The United Kingdom model, on the other hand, apparently provides no such protection for creators of derivative works. In a sense, the two models are mirror images of each other. Under Section 514, a reliance party can continue to exploit a derivative work as long as he pays compensation to the owner of the original copyright. In the United Kingdom, an author of a derivative work can continue to exploit the new work until the owner pays compensation to the reliance party.

We cannot say that one approach is clearly more protective of speech interests than the other. Although the United Kingdom model is arguably more protective of reliance parties' economic interests, we cannot say that it is substantially more protective of reliance parties' expressive interests. Moreover, even if the United Kingdom model is marginally more protective of speech interests,

> when evaluating a content-neutral regulation which incidentally burdens speech, we will not invalidate the preferred remedial scheme because some alternative solution is marginally less intrusive on a speaker's First Amendment interests. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

34

Turner II, 520 U.S. at 217–18 (internal citations, quotations, and ellipses omitted).

At its core, plaintiffs' challenge to Section 514 "reflect[s] little more than disagreement over the level of protection" that reliance parties should receive. See id. at 224. Congress sought to balance the interests between American copyright holders and American reliance parties. In so doing, Congress crafted a nuanced statute that offered some protections for both of these competing interests. It is not our role to opine on the best method of striking this balance. A statute's "validity does not turn on a [court's] agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." Id. at 218 (quotations and citation omitted). Plaintiffs may have preferred a different method of restoring copyrights in foreign works, but that is not what the Constitution requires; as long as the government has not burdened substantially more speech than necessary to further an important interest, the First Amendment does not permit us to second guess Congress's legislative choice. "We cannot displace Congress' judgment respecting content-neutral regulations with our own, so long as its policy is grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." Id. at 224.

We conclude that because Section 514 advances a substantial government interest, and it does not burden substantially more speech than necessary to

35

advance that interest, it is consistent with the First Amendment. Accordingly, the district court erred in ruling that Section 514 violates plaintiffs' freedom of expression.

## IV. Plaintiffs' Cross-Appeal (No. 09-1261)

Plaintiffs have cross-appealed, arguing that Section 514 is unconstitutional on its face. More specifically, "[p]laintiffs contend that removing works from the public domain of copyright (as distinct from patents) is an illegitimate means regardless of the end or the importance of the interest." Appellee's Br. at 56 (emphasis omitted). Facial challenges to statutes are generally disfavored as "[f]acial invalidation is, manifestly, strong medicine that has been employed by the [Supreme] Court sparingly and only as a last resort." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998) (quotations and citation omitted). As such, plaintiffs bear a "heavy burden" in raising a facial constitutional challenge. See id. (quotations omitted). They have not met this burden, as their arguments on appeal are largely foreclosed by our conclusion that Section 514 does not violate their freedom of expression, as well as by our previous decision in Golan I, which we are not free to revisit, as law of the case, see McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1034 (10th Cir. 2000) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quotations, alterations, and citations omitted)).

Plaintiffs assert that "there must be a 'bright line' drawn around the public domain . . . ." Appellees' Reply Br. at 6–7. But in Golan I, we rejected plaintiffs' argument "that, in the context of copyright, the public domain is a threshold that Congress may not traverse in both directions." Golan I, 501 F.3d at 1187 (quotation omitted). We stated that

> [t]he clear import of Eldred is that Congress has expansive powers when it legislates under the Copyright Clause, and this court may not interfere so long as Congress has rationally exercised its authority. Here, we do not believe that the decision to comply with the Berne Convention, which secures copyright protections for American works abroad, is so irrational or so unrelated to the aims of the Copyright Clause that it exceeds the reach of congressional power.

Id. (internal citation omitted). We held that Section 514 was within Congress's Article I powers, and therefore, Congress had the authority to extend copyright to works that were in the public domain. See id.

Of course, while Congress may have the authority under Article I to enact Section 514, it "must still comport with other express limitations of the Constitution." Id. Plaintiffs have cast their facial challenge to Section 514 in terms of "the First Amendment, the contours of which may be informed by the Progress [or Copyright] Clause." Appellees' Br. at 53. However, plaintiffs have provided no legal support for their claim that the First Amendment—either by itself or informed by any other provision of the Constitution—draws such absolute, bright lines around the public domain, and we are aware of no such authority.

37

Plaintiffs' only legal authority is <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954), but their reliance on <u>Bolling</u> is without merit. In <u>Bolling</u>, the Supreme Court announced that "[s]egregation in public education [wa]s not reasonably related to any proper governmental objective" and held "that racial segregation in the public schools of the District of Columbia [wa]s a denial of the due process of law guaranteed by the Fifth Amendment to the Constitution." <u>Id.</u> at 500. The Due Process analysis in <u>Bolling</u> does not inform plaintiffs' argument that the First Amendment makes the public domain of copyright absolutely inviolable. Instead, the First Amendment places the same restrictions on copyright restoration under Section 514 that it imposes on all other content-neutral regulations of speech. <u>See</u> <u>Golan I</u>, 501 F.3d at 1196.

In sum, Congress acted within its authority under the Copyright Clause in enacting Section 514. <u>See id.</u> at 1187. Further, Section 514 does not violate plaintiffs' freedom of speech under the First Amendment because it advances an important governmental interest, and it is not substantially broader than necessary to advance that interest. Accordingly, we REVERSE the judgment of the district court and REMAND with instructions to grant summary judgment in favor of the government.[11]

---

[11] Because we conclude that Section 514 does not violate plaintiffs' freedom of expression under the First Amendment, they are not entitled to injunctive relief.